IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Paul Perrea, | : | Case No. 1:08-cv-352 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING PLAINTIFF'S |
| | : | MOTION FOR PARTIAL SUMMARY |
| Cincinnati Public Schools, *et al.*, | : | JUDGMENT AND GRANTING IN |
| | : | PART AND DENYING IN PART |
| Defendants. | : | DEFENDANT'S MOTION FOR |
| | : | SUMMARY JUDGMENT |

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (doc. 30) and Defendants' Motion for Summary Judgment (doc. 29). Plaintiff Paul Perrea, a teacher for Defendant Cincinnati Public Schools ("CPS"), challenges the constitutionality of CPS guidelines that require CPS to try to maintain approximately the same racial balance for the teaching staff at each school within the district when making certain types of teacher placement decisions. Perrea also alleges race discrimination and First Amendment retaliation.

The Court ultimately concludes that Defendants did not retaliate against Perrea in violation of the First Amendment. The Court also concludes that Defendants are not liable for race discrimination insofar as they did not take an adverse employment action against Perrea for purposes of Title VII, Ohio Revised Code chapter 4112, or 42 U.S.C. § 1981. Nonetheless, the Court finds that the CPS staff racial balance guidelines are unconstitutional. Defendants violated Perrea's equal protection rights if they "surplussed" him on the basis of his race. Genuine issues of disputed material fact preclude summary judgment on Perrea's race discrimination claim founded upon the Equal Protection Clause. However, Defendant Mary Hahn is entitled to

1

qualified immunity on the equal protection claim.

Accordingly, and for the reasons that follow, the Court will **GRANT** Plaintiff's motion and **GRANT IN PART AND DENY IN PART** Defendants' motion.

## I. BACKGROUND

This statement of facts, except where otherwise indicated, is derived from the Defendants' Statement of Proposed Undisputed Facts (Doc. 29-1) and Plaintiff's Responses (Doc. 35-1) thereto.

### A. Perrea's Employment at CPS and Surplussing Provisions

CPS hired Paul Perrea as a long-term substitute teacher in December 2002. Perrea has taught science at Hughes Center, a CPS high school, since 2004. Perrea asserts that Hughes Center is the "highest performing" school in the CPS system that matches his training, experience, and individual qualifications.

Perrea is a member of the Cincinnati Federation of Teachers ("the Union"), the union representing CPS teachers. The terms of Perrea's employment are governed by a collective bargaining agreement ("CBA") between CPS and the Union. The dispute between Perrea and CPS in this case arises in part from provisions in the collective bargaining agreement which call for consideration of "the racial balancing of staff" when teachers are surplussed, *i.e.*, removed from their current position at a particular school based on decreased enrollment or a change in program offerings at that school. (CBA, 27-1 at 11.)

The surplus process is described in § 250(3) of the collective bargaining agreement:

3. <u>Surplussing</u>

a. <u>Reasons for Surplussing</u>

2

> Teachers may be surplussed due to a decreased enrollment or a
> change in program offerings or school organization. Surplussing
> shall be treated by the following procedures in the order of
> priority:
>
> (1) Before a teacher is treated as "surplus," voluntary transfer
> requests from that teacher's building shall be granted if the
> position is available.
>
> (2) Before a surplus teacher is transferred from his/her school, that
> teacher who is properly certificated may displace a junior teacher
> within the building, provided training, experience, and individual
> qualifications are substantially equal, *and the transfer is consistent
> with the racial balancing of staff*. . . .
>
> (3) When a surplus teacher is to be transferred from his/her
> building, that teacher shall have the opportunity to express
> preference for existing vacancies and be placed along with those
> teachers requesting a transfer, teachers returning from a leave of
> absence and unassigned teachers. If a choice needs to be made
> between two (2) or more teachers who are properly certificated and
> their training, experience, and individual qualifications are
> substantially equal *and the transfer is consistent with the racial
> balancing of staff,* seniority shall control the choice.

(*Id.* (emphasis added).) Pursuant to the collective bargaining agreement, teachers who are

surplussed remain employed by CPS and have the opportunity to transfer to any existing vacancy

in the school district. If a teaching position opens up in the teacher's original school, the

surplussed teacher has the right to stay at the school. Other provisions in the collective

bargaining agreement relating to teacher transfers also require that transfers should be

"consistent with the racial balancing of the staff." (*Id.*, 27-1 at 7, 10.) Racial balancing is not

mentioned in any provision of the collective bargaining agreement that relates to hiring, firing, or

laying off teachers.

Staff racial balance provisions are contained in at least one other CPS document. Paul

McDole, a human resources manager at CPS, testified that the CPS treasurer's department

provides the CPS Student-Based Budgeting Guideline for HR/Staffing ("Budgeting Guideline")

to schools to aid in the student-based budgeting process.  (McDole Dep. 84, 84-90.)  The

Budgeting Guideline contains a paragraph called "Staff Racial Balance" that addresses the racial

composition of the staff at each school. (*Id.*; Budgeting Guideline, Doc. 31-5 at 3.)  The "Staff

Racial Balance" provision provides, in relevant part, as follows:

> It is important that the staff racial balance for each school be maintained as close
> as possible when considering surplussing.  However, a school shall be in
> compliance with Board Policy if the school is within plus or minus 10% of the
> representative teacher work force.

(Budgeting Guideline, Doc. 31-5 at 3.)  McDole testified that treasurer's department did not send

out the Budgeting Guideline to the CPS school principals for the 2008–2009 school year.

(McDole Dep. 136.)

## B.  Transfer Requests and Requests for Release of Semester Exams

During the 2005–2006 school year, Perrea initiated a voluntary transfer request by filling

out a "Transfer Request Form" and selecting positions at Taft High School and Woodward

Career Technical as his transfer choices.  (Perrea Dep. 67-71.)  Perrea testified that he was not

sure that he would have accepted a transfer away from Hughes Center, but that he wanted to

learn more about the specifics of open positions.  (*Id.*)  CPS did not select Perrea for the transfer

positions at Taft or Woodward.  Perrea filed a grievance concerning his transfer requests, but the

Union withdrew Perrea's grievance without his consent.

During the 2006–2007 school year, Perrea again voluntarily submitted a Transfer

Request Form and selected positions at Clark Montessori, Walnut Hills, and Western Hills

Design Tech as his transfer choices.  Perrea continued teaching science at Hughes Center after he

was not selected for a transfer position.

In February 2007, during the 2006–2007 school year, Perrea asked a CPS administrator, Dr. Elizabeth Holtzapple, when the semester exams administered to CPS ninth-grade students would be made available to the public. Dr. Holtzapple responded that the semester exams were "secure test documents" and would not be released publicly. Perrea continued to request that the exams be released. Defendants characterize Perrea's communications as unprofessional and inappropriate, including one email in which Perrea called the semester exams "a joke" and referred to CPS administration as "dysfunctional and mendacious." (Doc. 31-11 at 5.)[1] Defendant Mary Hahn, the principal at Hughes Center, counseled Perrea in a letter dated March 16, 2007 to communicate with CPS administrators in a more professional manner. (Perrea Dep. 199-200; Doc. 31-11 at 3.) Perrea was brought to a disciplinary council meeting in May 2007 about his semester exam requests. (Perrea Dep. 199-200; Hahn Dep. 174, 177-79, 184-85.)

Perrea testified that Principal Hahn told him on May 30, 2007 that he would be disciplined. (Perrea Dep. 199-200.) Perrea testified further that Principal Hahn told him that he should "stop wasting [his] time on the semester exams and be the best teacher that [he] can." (*Id.* at 199-200, 209.) Nonetheless, CPS did not formally discipline Perrea for his communications regarding his request to review the semester exams.

On April 21, 2008, Plaintiff filed a mandamus action in the Ohio Supreme Court seeking the release of the semester exams as public records under the Ohio Public Records Act. *Perrea*

---

[1] Perrea attempts to rebut Defendants' characterization of his emails by citing to a portion of Mary Hahn's deposition wherein she states that she was not aware of Perrea sending inappropriate emails. (Hahn Dep. 199.) However, in context, Hahn appears to be testifying either that Perrea did not send inappropriate emails after March 16, 2007 or that he did not send inappropriate emails to her. (*Id.*) Her testimony cannot be taken to foreclose Defendants' argument that Perrea's emails were inappropriate.

*v. Cincinnati Pub. Schs.*, No. 2008-0748 (Ohio). On September 17, 2009, the Supreme Court of

Ohio issued a slip opinion denying the writ of mandamus. *Id.* slip. op. (Ohio Sept. 17, 2009).

## C.    Perrea is Surplussed But Continues Employment at Hughes Center

During the 2007–2008 school year, approximately 101 teachers were assigned to Hughes

Center. CPS determined in February 2008 to eliminate surplus teaching positions at Hughes

Center based on changes in enrollment and corresponding reductions in teacher allocations.

Principal Hahn was informed that she needed to surplus twenty-seven teaching positions for

Hughes Center for the following 2008–2009 school year. On or about February 21, 2008, Hahn

told Perrea that he was being surplussed. Perrea testified that Hahn told him that he had been

"surplussed for racial balancing." (Perrea Dep. 93-94.) He also stated that Hahn referenced a

seniority list of the teachers and indicated that, while Perrea was white, another science teacher

who was not surplussed was black. (*Id.* at 96-97, 125.) Hahn, conversely, stated in a sworn

declaration, that she chose to surplus Perrea because she determined him to be less qualified than

the other science teachers at Hughes Center. (Hahn Decl. ¶ 4.) Perrea had the opportunity to

apply to transfer to vacant positions within CPS for which he was qualified. Perrea understood

that he could remain at Hughes Center if a position opened up at Hughes Center. Perrea

continued to teach the same courses and to have the same responsibilities at Hughes Center for

the remainder of the 2007–2008 school year.

In June 2008, a Hughes Center science teacher resigned her position. Pursuant to the

collective bargaining agreement, Hahn informed Perrea in July 2008 that he could continue

teaching at Hughes Center. Perrea returned to Hughes Center for the 2008–2009 school year.

Perrea suffered no loss in pay, benefits, or job duties as a result of being on the surplus list for

approximately five months. However, Perrea alleges that he suffered emotional distress and feelings of victimization because he was surplussed on the basis of his race. (Perrea Aff. at 56; Perrea Dep. 101.) He also asserts that he was prevented from pursuing opportunities to run for the position of building representative and chair of the science department at Hughes Center for the 2008–2009 school year. (Perrea Dep. 141, 178-80, 190, 247.) Both the building representative and department chair are paid positions. (*Id.*) Perrea notes that one year later he was selected for the building representative and science department chair positions for the 2009–2010 school year. (Perrea Dep. 180, 216.)

**D.      Procedural History**

Perrea initiated this suit against CPS and Mary Hahn and moved for a temporary restraining order in May 2008 after he was surplussed, but before he was informed in July 2008 that he could continue teaching at Hughes Center. (Docs. 1, 3.) The Court declined to issue a temporary restraining order after Perrea was returned to a position at Hughes Center on the ground that Perrea could not establish irreparable harm. (Doc. 17.)

Perrea filed a First Amended Complaint on June 8, 2009. (Doc. 10.) Perrea asserts five claims in the First Amended Complaint:

1.      Race discrimination in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*;
2.      Race discrimination in violation of 42 U.S.C. § 1981;
3.      Race discrimination in violation of the Equal Protection Clause of the Constitution pursuant to 42 U.S.C. § 1983;
4.      Race discrimination in violation of Ohio Revised Code §§ 4112.01, *et seq.*; and
5.      Violation of the First Amendment of the Constitution pursuant to 42 U.S.C. § 1983.

(*Id.*) Perrea seeks damages and an order "declaring that the racial balancing system at CPS is a violation of federal statutory and constitutional law." (*Id.* at 9.)

7

Defendants now move for summary judgment as to each of the claims asserted against them. Perrea moves for partial summary judgment insofar as he seeks the Court to declare that the racial balancing system for teachers and staff at CPS is a violation of the Equal Protection Clause and Title VII.

## II.    *BRONSON* CASE

CPS asserts that its staff racial balancing policy has its origin in the Consent Decree issued in *Bronson v. Board of Education of Cincinnati*, No. 1:74-cv-205 (S.D. Ohio), a case initiated by parents and children in the CPS system who alleged that CPS was racially segregated. *Bronson v. Bd. of Educ. of Sch. Dist. of City of Cincinnati*, 604 F. Supp. 68, 70 (S.D. Ohio 1984). The parties in *Bronson* reached a settlement agreement that was entered as a Consent Decree in June 1984. *Id.* at 82. Section 5 of the 1984 Consent Decree addressed the issue of staff racial balance:

> The Cincinnati Board of Education currently has in force a policy which requires that the staff in each of its schools has a racial composition which is within 5% of the racial composition of the staff in the district as a whole. The Board shall maintain that policy in effect and take the steps necessary to ensure that it is enforced.

*Bronson v. Bd. of Educ. of Sch. Dist. of City of Cincinnati*, No. 1:74-cv-205, 1991 WL 1101072, at *10 (S.D. Ohio June 26, 1991).

The 1984 Consent Decree was set to expire by its terms on June 30, 1991. *Id.* at *1. The Court undertook a compliance review of the Consent Decree shortly before it expired. CPS admitted in June 1991 that it was not in full compliance with Section 5 of the Consent Decree, but it stated that it could be in compliance by the start of the 1991–1992 school year. *Id.* at *11. The Court agreed to withdraw its jurisdiction over Section 5 of the Consent Decree under the

8

following conditions:

> Upon certification by the CSD [Cincinnati School District] shortly after the beginning of the 1991–1992 school year that all schools are in compliance with the staff racial balance policy, the Court will dissolve its jurisdiction over § 5 of the Consent Decree. At that time, the Board will be free to adopt, at least in so far as the *Bronson* Consent Decree is concerned, whatever policies regarding staff racial balance it deems advisable, whether through collective bargaining or otherwise.

*Id.* On February 4, 1992, Judge Rice issued a Decision and Entry declaring CPS to be in compliance with Section 5 of the Consent Decree dealing with staff racial balance. *Bronson*, No. 1:74-cv-205, Doc. 797 (S.D. Ohio Feb. 2, 1992).

However, on November 10, 1993, the parties filed a new Settlement Agreement which was approved as an Amended Consent Decree on August 19, 1994. *Bronson*, No. 1:74-cv-205, Docs. 820, 835.[2] The 1993 Settlement Agreement again addressed the issue of staff racial balance in the CPS system. The parties agreed in Section I(C) of the Settlement Agreement to maintain in effect and enforce a part of a policy, CPS Policy No. 4001, previously adopted by CPS as follows:

> The Parties recognize that a key element in maintaining racial balance in the student population of [CPS] is the pursuit of policies that will avoid schools becoming racially identifiable as a result of the racial composition of their faculty and staff. . . .
>
> * * * *
>
> Teachers shall be assigned on such basis that each elementary and each secondary school will have a racial representation of teachers that falls within plus or minus ten percent of the racial representation with the respective teacher work force at the elementary and secondary levels.

---

[2] The relevant *Bronson* documents are filed in this case as exhibits to the Declaration of Daniel J. Hoying at Doc. 29-2.

(Settlement Agreement, Doc. 29-2 at 6-7.)  The full text of CPS Policy No. 4001 was attached as an appendix to the Settlement Agreement.  (*Id.*, Doc. 29-2 at 24.)  The portion of the Settlement Agreement containing the staff racial balance provision by its terms expired "twenty-four months after the entry of the Court order approving the [Settlement] Agreement."  (*Id.*, Doc. 29-2 at 19.)  Thus, the staff racial balance provision in the Settlement Agreement expired by the terms therein on August 19, 1996.

On April 28, 1998, plaintiffs in the *Bronson* case moved to re-open the case and for an order securing specific performance.  *Bronson*, No. 1:74-cv-205, Doc. 847.  On June 7, 1999, Judge Rice granted the motion in part and re-opened the litigation.  *Bronson*, No. 1:74-cv-205, Doc. 866.  The docket sheet indicates that in 1999 the parties briefed the issue of whether the CPS defendants had breached the Amended Consent Decree (a.k.a. the Settlement Agreement).  *Bronson*, No. 1:74-cv-205, Docs. 872-74.  There are no further entries on the docket sheet until May 27, 2008 when the case was terminated without explanation.  Based on the records available, the Court concludes that the Settlement Agreement is no longer in effect, at least as it governs staff racial balancing within the CPS school district.

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT MOTIONS

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec.*

10

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## IV.    PERREA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Perrea seeks summary judgment insofar as he asks the Court to declare that the staff racial balancing system at CPS violates the Equal Protection Clause and Title VII. The Declaratory Judgment Act provides that provides that in "a case of actual controversy within its jurisdiction" a federal court "may" issue a declaratory judgment. 28 U.S.C. § 2201.

### A.    Standing

Before addressing the merits of Perrea's claims, the Court must determine whether he has standing to seek declaratory relief. Article III of the Constitution limits the jurisdiction of the federal courts to cases and controversies. U.S. Const. art. III, § 2. The three-part constitutional test for standing was set forth by the Supreme Court in *Lujan v. Defenders of Wildlife,* 504 U.S.

555 (1992). First, the plaintiff must have suffered actual (as distinguished from hypothetical) "injury in fact — an invasion of a legally protected interest" which is both "(a) concrete and particularized" and "(b) actual or imminent." *Id.* at 560 (internal quotations and citations omitted). Second, there must have been "a causal connection between the injury and the conduct complained of. " *Id.* at 561. Finally, it must be likely that the injury will be redressed by a favorable decision. *Id.* "By now, it is axiomatic that a litigant demonstrates Article III standing by tracing a concrete and particularized injury to the defendant—whether actual or imminent—and establishing that a favorable judgment would provide redress." *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 608 (6th Cir. 2008).

A plaintiff's burden to establish standing increases at each successive stage of litigation. The Supreme Court explained as follows in *Lujan*:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

504 U.S. at 561 (internal quotations and citations omitted); *see also Phillips v. Cohen*, 400 F.3d 388, 396 (6th Cir. 2005) (stating that at summary judgment a plaintiff must present some proof demonstrating an injury-in-fact).

The Supreme Court has stated generally in cases where voluntary affirmative action programs are being challenged on equal protection grounds that the "injury in fact" sufficient to confer standing "is the inability to compete on an equal footing." *Ne. Fla. Chapter of the Assoc.*

12

*Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). The Court reaffirmed this holding in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007), wherein the Court held that "one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff." *Id.* at 719; *see also Aiken v. Hackett*, 281 F.3d 516, 519 (6th Cir. 2002) ("If . . . the plaintiffs allege some kind of on-going constitutional violation and seek forward-looking relief to level the playing field, then the plaintiffs need only show that the racial preference hinders their ability to 'compete on an equal footing.'").[3]

At the time Perrea filed the initial Complaint in this action, Defendants had informed him that he was being surplussed for the 2008–2009 school year. The fact that Defendants later informed Perrea in July 2008 that he could return to teaching at Hughes Center for the 2008–2009 school year is not relevant to the standing analysis. "[S]tanding does not have to be maintained throughout all stages of litigation." *Cleveland Branch, N.A.A.C.P. v. City of Parma, Ohio*, 263 F.3d 513, 524 (6th Cir. 2001). "Instead, it is to be determined as of the time the complaint is filed." *Id.*

Perrea has put forward specific evidence that he was forced to compete in a race-based system insofar as staff racial balance is a factor in surplus decisions. The CPS teachers' collective bargaining agreement states that the staff racial balance is to be considered in surplus decisions provided that training, experience, and individual qualifications of the teachers are substantially equal. (CBA, Doc. 27-1 at 11; McDole Dep. 74-75.) Also, both Perrea and another

---

[3] The Court applies these relevant equal protection cases on standing rather than the First Amendment-based standing case, *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602 (6th Cir. 2008), suggested by Defendants.

13

CPS teacher, Sondra Parsons, testified that Principal Hahn referred to racial balancing when discussing her decision to surplus Perrea. If the Court declares the staff racial balance provisions unconstitutional, then Perrea would no longer be forced to compete in the race-based surplus system. Therefore, the Court finds that Perrea has standing to facially challenge the staff racial balance provisions on equal protection grounds.

One final point should be addressed. The Court concludes in the analysis of Perrea's Title VII claims, *infra*, that Perrea cannot establish a violation of Title VII. That is, the Court concludes that Defendants' decision in February 2008 to surplus Perrea for the following school year was not an adverse action for purposes of Title VII as a matter of law. This legal conclusion does not mandate a finding, however, that Perrea did not suffer an injury-in-fact for purposes of establishing standing. A surplussed teacher at CPS can be subjected to an involuntary transfer to a lateral position. Courts in the Sixth Circuit have recognized that an employee who is subjected to an involuntary lateral transfer on unconstitutional grounds has a cognizable claim. *See Boger v. Wayne Cty.*, 950 F.2d 316, 321-22, 324-26 (6th Cir. 1991); *Ware v. Curley*, 934 F. Supp. 259, 263-64 (E.D. Mich. 1996). The Court explained in *Boger*:

> The district court erred in granting summary judgment on the equal protection and First Amendment claims on the basis of its finding that the plaintiff suffered no injury because she lost neither grade nor salary in the transfer. Plaintiff need not have suffered loss of salary, promotional opportunities, seniority or other monetary deprivations to have a cognizable interest protected by the First Amendment or the equal protection clause. In both counts, the plaintiff alleged injuries consisting of extreme embarrassment, humiliation, extreme mental anguish, and loss of professional esteem.

> * * * *

> Treating the equal protection claim as based upon an involuntary transfer and a failure to promote, we have examined the record to determine if the plaintiff's responses to the motion for summary judgment raised genuine issues of material

14

> fact. We note, first, that both the expired union contract and the new one gave the County complete discretion to transfer an employee from one position to another position within the same class. Nevertheless, an employer possessing such authority may not transfer an employee for reasons that infringe upon rights guaranteed by the United States Constitution.

950 F.2d at 321, 324; *see also Ware*, 934 F. Supp. at 263 ("Even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely[, including that i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests."). Perrea claims that he suffered severe emotional distress after he was surplussed. Therefore, if Perrea was surplussed on the basis of his race, then he suffered an equal protection injury.

**B.    Merits of Facial Challenge**

Perrea alleges that the staff racial balance provisions adopted by CPS facially violate the Equal Protection Clause.[4] The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State . . . shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14 § 1. Defendants defend the constitutionality of the staff racial balance provisions. They contend that the provisions originally were adopted to comply with the dictates of the 1984 Consent Decree and the 1993 Settlement Agreement from the *Bronson* case. They further argue that the staff racial balance provisions are constitutional under binding Sixth Circuit precedent.

---

[4] Perrea also asserts a facial challenge to the staff racial balance provisions on the basis of Title VII. Given that the Court finds in the analysis above, *infra*, that the staff racial balance provisions must be struck down as violating the Equal Protection Clause, the Court declines to consider whether the provisions could be struck down on an alternative basis as well.

15

This Court does not write on a clean slate in examining CPS's staff racial balance provisions. The Supreme Court and the Sixth Circuit have analyzed similar affirmative action-type programs adopted pursuant to school desegregation plans. Controlling Supreme Court precedents establish that all racial classifications must be subjected to strict scrutiny analysis. "It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720; *see also Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (stating that all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized). The Supreme Court has applied strict scrutiny to analyze a collective bargaining agreement provision which protected certain minority teachers against layoffs. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 270, 273-74 (1986). Strict scrutiny requires that the use of racial classifications must be "narrowly tailored" to meet a "compelling" government interest. *See Parents Involved*, 551 US. at 720; *see also Gratz*, 539 U.S. at 270 (same). "When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003).

"Strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." *Id.* To survive the exacting review of strict scrutiny, a school district must show that "they considered methods other than explicit racial classifications to achieve their stated goals." *Parents Involved*, 551 U.S. at 735. The school district, however, need not exhaust "every conceivable race-neutral alternative." *Grutter*, 539 U.S. at 339.

16

Additionally, narrow tailoring requires that a race-conscious classification system "not unduly harm members of any racial group" and the system must be employed for only a limited period of time.  *Id.* at 341-42.

A better understanding of the *Parents Involved* case will aid in the constitutional analysis of the CPS racial balancing provisions.  The two school districts in the *Parents Involved* case "voluntarily adopted student assignment plans that rely on race to determine which public schools certain children may attend."  551 U.S. at 709-10.  The issue presented was "whether a public school that had not operated legally segregated schools or has been found to be unitary may choose to classify students by race and rely upon that classification in making school assignments."  *Id.* at 711.  After affirming that the classification system had to be analyzed pursuant to the strict scrutiny standard, the Supreme Court recognized only two compelling interests in the school desegregation context: (1) "remedying the past effects of past intentional discrimination" and (2) attaining diversity in higher education setting.  *Parents Involved*, 551 U.S. at 720-22.  Consistent with this holding, the Supreme Court in the earlier *Wygant* teacher integration case had rejected as a compelling justification the remedying of general societal discrimination.  476 U.S. at 274, 276.[5]

_____

[5] A plurality of Justices in *Parents Involved*, Chief Justice Roberts along with Justices Scalia, Thomas, and Alito, further stated that racial classifications could not be used to achieve a goal of mere "racial balance, . . . an objective this Court has repeatedly condemned as illegitimate." 551 U.S. at 726 (plurality op.).  "Allowing racial balancing as a compelling end in itself would effectively assure that race will always be relevant in American life, and that the ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race will never be achieved." *Id.* at 730 (plurality op.) (internal quotation and citation omitted).  "Outright racial balancing" also was criticized as "patently unconstitutional" in *Grutter*.  539 U.S. at 330.  The plurality concluded in *Parents Involved*, after recognizing that the school districts involved in the case had either never segregated on the basis of race or already had removed the vestiges of past discrimination, that "[t]he way to stop discrimination

The Supreme Court stated in *Parents Involved*, when discussing the first compelling interest, that the Kentucky school district being sued did not, and could not, rely on an interest in remedying past intentional discrimination. 551 U.S. at 720-21. The Kentucky school district had been subjected to a desegregation court decree, but that decree had been dissolved in 2000 after the district court concluded that harm traceable to past segregation had been remedied. *Id.* The Supreme Court stated that once the school district "had remedied the constitutional wrong that allowed race-based assignments[, then a]ny continued use of race [had to] be justified on some other basis." *Id.* at 721.

Further, the Supreme Court made clear in *Parents Involved* that the second compelling interest was limited to diversity in higher education as recognized by the Court in *Grutter v. Bollinger*. *Id.* at 722. The university in *Grutter* did not limit student body diversity to issues of race, but also considered factors such as experience traveling abroad, fluency in multiple languages, experience overcoming hardship, significant community service, career experience, and academic and non-academic achievement. *Grutter*, 539 U.S. at 338. The Supreme Court in *Grutter* relied on "considerations unique to higher education" including the "'expansive freedoms of speech and thought associated with the university environment.'" *Parents Involved*, 551 U.S. at 724 (quoting *Grutter*, 539 U.S. at 329). For that reason, in *Parents Involved,* the Supreme Court held that the *Grutter* justification — that diversity was a compelling interest in higher education — did not apply to elementary and high school education systems. *Id.* at 724-25.

---

on the basis of race is to stop discriminating on the basis of race." 551 U.S. at 748 (plurality op.)

Turning to the CPS staff racial balancing provisions, the Court begins by recognizing that the provisions must be subjected to strict scrutiny. *Parents Involved*, 551 U.S. at 720; *Wygant*, 476 U.S. at 270, 273-74. However, neither compelling interest recognized in *Parents Involved* applies here. First, the *Grutter* compelling interest of diversity in higher education does not apply to the primary or secondary schools run by CPS. *Parents Involved*, 551 U.S. at 724-25. Second, contrary to CPS's argument, the compelling interest in remedying past discrimination does not apply here. The *Bronson* case has been dismissed and the 1984 Consent Decree and 1993 Settlement Agreement therein have expired. The Supreme Court has instructed that in this circumstance the school district must justify its use of a racial classification on some other basis. *See Parents Involved*, 551 U.S. at 721. Defendants do not suggest another compelling justification for the staff racial balance provisions. Accordingly, based on the foregoing authorities, the CPS staff racial balance provisions facially violate the equal protection guarantee of the Constitution.

Defendants insist, despite the foregoing analysis, that the CPS racial balance provisions are valid under controlling Sixth Circuit precedent. Primarily, CPS points out that the Sixth Circuit upheld the CPS policy for transferring teachers sixteen years ago, prior to the Supreme Court decisions in *Parents Involved* and *Grutter,* but after the Supreme Court decision in *Wygant*. *See Jacobson v. Cincinnati Bd. of Educ.*, 961 F.2d 100 (6th Cir. 1992). The CPS policy at that time, as now, restricted the right of some teachers to transfer, while requiring the reassignment of other teachers, with a goal of achieving racial balance in the teaching staff across the school district as a whole. *Id.* at 101-02. The Sixth Circuit noted that the policy was "race conscious" because it permitted the Board to base teacher transfers solely on race, but also

19

"specific race neutral in that there is no disparate impact as to race in its application." *Id.* at 102. "In some instances, it will benefit or harm white teachers; in others, it will benefit or harm black teachers." *Id.* The Sixth Circuit applied only an intermediate level of scrutiny — the CPS policy had to be "substantially related to an important government objective" — because the policy did not favor one race over another. *Id.* at 103. It held that the objective of "achiev[ing] a racially integrated faculty throughout the Cincinnati public school system" was legitimate. *Id.* The Sixth Circuit cited *United States v. Montgomery County Bd. of Educ.*, 395 U.S. 225, 231-32 (1969), for the proposition that "the attainment of an integrated teaching staff is a legitimate concern in achieving a school system free of racial discrimination." *Id.* at 102.

Defendants are correct that *Jacobson* has not been specifically overturned. However, the Sixth Circuit has not been required to analyze *Jacobson* in light of subsequent Supreme Court precedents mandating that "all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized." *Gratz*, 539 U.S. at 270 (internal quotation and citation omitted). For example, the Seattle school district in *Parents Involved* involved a student assignment system that used the goal of maintaining each school within ten percent of the district's overall white/non-white racial balance as a secondary tiebreaker to determine which students would be assigned to oversubscribed schools. *See* 551 U.S. at 712. This student assignment system is materially similar to the staff racial balance provisions by CPS that were described by the Sixth Circuit in *Jacobson* as "race conscious" but "specific race neutral." 961 F.2d at 102. Under both systems, both white and/or non-white students and teachers could be affected by the requirement to maintain racial balance throughout the respective districts. The Supreme Court applied strict scrutiny to analyze the Seattle school district in *Parents Involved.*

20

Likewise, the Sixth Circuit today would apply strict scrutiny to analyze the CPS staff racial balance provisions. The *Jacobson* case, therefore, does not require this Court to uphold the CPS staff racial balance provisions because the Sixth Circuit did not recognize a compelling government justification for the provisions.

In addition to relying on the *Jacobson* case, Defendants also assert that the Sixth Circuit implicitly authorized staff racial balance provisions in the much more recent case of *Robinson v. Shelby County Board of Education*, 566 F.3d 642 (6th Cir. 2009). The Sixth Circuit considered in *Robinson* whether to uphold a district court decision denying a joint motion to certify that a school district had achieved unitary status as to "faculty integration." *Id.* at 654-56. After refusing to certify that the school district had achieved faculty integration, the district court had issued a remedial plan which would have required the racial composition of the school district's faculty to correspond to the racial composition of the student population. *Id.* The Sixth Circuit reversed as clear error the district court's determination that the school district had not achieved unitary status in regards to faculty integration. *Id.* The Sixth Circuit also struck down the district court's proposed remedial plan stating that it would have resulted in race-based hirings and firings in a yearly effort to obtain a minority teacher rate equivalent to the ever-changing minority student rate. *Id.* "Race-based hiring of the sort ordered by the district court violates the Constitution." *Id.* at 656.

The Sixth Circuit stated in *Robinson* that students, with respect to the racial composition of the teaching staff, were entitled to only a "sustained good faith effort to recruit minority faculty members so as to remedy the effects of any past discriminatory practices." *Id.* at 654 (quoting *Oliver v. Kalamazoo Bd. of Educ.*, 706 F.2d 757, 762 (6th Cir. 1983)). "The

21

Constitution requires only that schools be staffed so that no school is racially identifiable based on government action." *Id.* at 656. Defendants here cite to dicta wherein the Sixth Circuit opined that where staff desegregation orders are appropriate, instead of matching teachers' racial composition to the students' racial composition, a "court's orders should require that the faculty of each school reflect the systemwide racial ratio of faculty members." *Id.* at 655 (citing *United States v. DeSoto Parish Sch. Bd.*, 574 F.2d 804, 816 (5th Cir. 1978) and *United States v. Montgomery Cty. Bd. of Educ.*, 395 U.S. 225, 232 (1969)).

Contrary to CPS's arguments, this dicta in *Robinson* is not a ground for upholding the CPS staff racial balance provisions. Importantly, the school districts in the *DeSoto Parish* and *Montgomery County* cases cited by the Sixth Circuit in *Robinson* required faculty integration orders to remedy unconstitutional state-imposed segregation. *Montgomery Cty.*, 395 U.S. at 225-26, 232; *DeSoto Parish*, 574 F.2d at 807, 816. The Sixth Circuit in *Robinson*, by contrast, did not order or authorize the district court to impose any requirement as to the faculty racial composition after holding that the school district had achieved unitary status. Here, likewise, the CPS desegregation orders originating in *Bronson* have expired and CPS provides no compelling state interest justifying the staff racial balance provisions.

For all the foregoing reasons, the Court holds that the CPS staff racial balance provisions violate the equal protection guarantee of the Fourteenth Amendment to the United States Constitution.

## V.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.    Race Discrimination Claims

Perrea alleges that Defendants surplussed him in February 2008 based on his race (*i.e.*,

pursuant to the staff racial balance provisions) in violation of 42 U.S.C. § 1981, the Fourteenth

Amendment pursuant to 42 U.S.C. § 1983, Title VII, and Ohio Revised Code chapter 4112.

Title VII and Ohio Revised Code chapter 4112 both prohibit race discrimination in employment

and are analyzed under the same standards. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2

(6th Cir. 2000) (citing *Plumbers and Steamfitters Jt. Apprenticeship Comm. v. Ohio Civil Rights

Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)). Section 1981 prohibits racial discrimination in the

making and enforcement of private contracts, and claims under § 1981 likewise are analyzed

under the Title VII standards. *See Newman v. Federal Exp. Corp.*, 266 F.3d 401, 406 (6th Cir.

2001). Finally, "a plaintiff asserting a Fourteenth Amendment equal protection claim under 42

U.S.C. § 1983 must prove the same elements required to establish a disparate treatment claim

under Title VII." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). Under both statutes,

"the plaintiff must establish by a preponderance of the evidence that [he] was the victim of

intentional or purposeful discrimination." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir.

1988).

Perrea correctly points out that under Title VII, an employer is liable if race was a

"motivating factor" for the unlawful employment action. 42 U.S.C. § 2000e-2(m).[6] His reliance

---

[6] The statute provides:

Impermissible consideration of race, color, religion, sex, or national origin in employment practices

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m).

on 42 U.S.C. § 2000e-2(m) suggests that he is stating a mixed-motive claim.[7] "[A] Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008). A mixed-motive case should be sent to the jury unless "the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.* The defendants can establish a limited affirmative defense to a mixed-motive case — "that [the employer] would have taken the same action in the absence of the impermissible motivating factor" — which limits the available remedy to declaratory relief, injunctive relief, and attorney's fees and costs." 42 U.S.C. § 2000e-5(g)(2)(B).

The same mixed-motive analysis does not apply to the equal protection claim. A plaintiff has an initial burden in equal protection cases to prove that race was a motivating factor. *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 271 (1977). But then, an employer can evade liability by establishing that it would have taken the same conduct in the absence of the forbidden racial consideration. *Texas v. Lesage*, 528 U.S. 18, 20-21 (1999); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 285-86 (1977). "Simply put, where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury warranting relief under § 1983." *Lesage*, 528 U.S. at 21.

---

[7] *See* Doc. 35 at 6.

Defendants here move for summary judgment on the race discrimination claims on the grounds that Perrea did not suffer a materially adverse employment action when he was surplussed. The Sixth Circuit has expounded upon the requirement that a plaintiff establish that his employer took a materially adverse employment action in a Title VII action as follows:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (citation omitted). Defendants contend that either the surplus decision constituted a *de minimis* employment action which was not materially adverse, or if it was materially adverse, so temporary in its effect as to not constitute an actionable adverse employment action as a matter of law. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461-62 (6th Cir. 2000) (stating that *de minimis* actions and temporary actions which do not result in a loss of income are not materially adverse).

Being surplussed by CPS does not result in the loss of employment, but rather is akin to being subjected a lateral job transfer. A lateral job transfer ordinarily does not constitute an adverse action. *See Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004) (stating that the denial of a lateral transfer, without additional benefits or prestige, is not an adverse action); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (holding that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions"); *Jacox v. Cincinnati Public Schs.*, No. 1:06-cv-168, 2007 WL 2156650, at *6 (S.D. Ohio July 26, 2007) (stating in dicta that a job transfer that did not result in a change in his job description, salary, or benefits could not be an adverse employment action). On the other hand, a

25

job transfer that results in a loss of prestige can constitute an adverse action in appropriate circumstances. *See Mitchell*, 389 F.3d at 183; *Kocsis*, 97 F.3d at 876-77. A plaintiff usually must offer more than his own "subjective impression concerning the desirability of one position over another" to establish an actionable loss of prestige. *Mitchell*, 389 F.3d at 183. Rather, the plaintiff's proof of an adverse action must consist of "objective factors, not subjective impressions." *Freeman v. Potter*, 200 F. App'x 439, 442-43 (6th Cir. 2006). "A material adverse action may consist of a less distinguished title, diminished options for advancement, or other unique indices." *Id.* at 442.

Here, Perrea did not lose his position or suffer any loss of pay in February 2008 when he was told he would be surplussed. In July 2008, Perrea was placed back at Hughes Center obviating any potential materially adverse consequence which could have been caused by his lateral transfer to a position at a different school. Nonetheless, Perrea contends that the decision to surplus him in February 2008 was materially adverse because he suffered lost opportunities to become a building representative and chair of the science department at Hughes Center for the 2008–2009 school year. The science department chair earned a $3,000.00 per year stipend. (Perrea Dep. 141, 190.) The department chair position was determined by a vote of the science department teachers on the first day of the school year. (*Id.* at 186-88.) Perrea testified that there was a consensus building process that took place among the science department teachers in the summer prior to the vote. (*Id.* at 187, 247-48.) He stated that when he returned to Hughes Center at the start of the 2008–2009 school year it was a "done deal" that another teacher would be chair. (*Id.*) Perrea stated that he did inform the science teachers on the day of the vote that he wanted to run for the chair position, but that he "didn't have a chance" to win the position

26

because he'd been "iced out that summer" as a result of being on the surplussed teachers' list. (*Id.* at 186-88, 247-48.)  Perrea was selected as the science department chair for the 2009–2010 school year.  (*Id.* at 216.)

The building representative position paid a smaller stipend of $1,500.00 per year.  (Perrea Dep. 141.)  The election for the 2008–2009 school year position was held among the staff in the spring of the previous school year.  (Beirne Dep. at 26.)  The election was preceded by a "soft sell type campaign" consisting of distribution of flyers and conversations with colleagues.  (*Id.* at 26-27, 31.)  Perrea was on the surplussed teachers' list in the spring of 2008 when the election was held for the 2008–2009 building representative position and he could not run for the position.  (Perrea Dep. 141, 178.)  In May 2009, Perrea ran for and was elected a building representative of Hughes Center for the 2009–2010 school year.  (*Id.* at 180.)  Defendants did not play a role in the election of the building representative.  (Parsons Dep. 19-20.)

After considering Perrea's evidence, the Court finds that the alleged loss of opportunities to serve as building representative and science department chair are too speculative as a matter of law to render the surplus decision a materially adverse action for purposes of Title VII.  Perrea has not offered evidence—such as affidavit or deposition testimony—that he would have run for the building representative position in 2008 had he not been on the surplus list.  As to the science chair position, Perrea has not explained why he did not use the month of July 2008, after he was returned to a position at Hughes Center, to build a consensus for his election.  Perrea has offered insufficient evidence concerning the qualifications of the other candidates for either position nor the reasons why winning candidates were selected.  Finally, Perrea has not offered evidence from any of his co-workers that they would have voted for him for the building representative

27

position or the science department chair position for the 2008–2009 school year had he not been on the surplus list from February 2008 until July 2008.  Without this type of specific evidence, Perrea's contention that he lost opportunities is mere speculation.

The Court concludes that no genuine issues of material fact remain and that Perrea did not suffer an adverse employment action as a matter of law, with the one significant exception as to his equal protection claim as noted below.  Therefore, Defendants are not liable for race discrimination in violation of Title VII, 42 U.S.C. § 1981, or Ohio Revised Code chapter 4112 because they did not commit an adverse employment action against Perrea.  Accordingly, Defendants are entitled to summary judgment on these race discrimination claims.

However, the requirement that the employer commit an adverse action against the plaintiff has a different meaning in regards to an equal protection claim.  In *Boger*, the Sixth Circuit held that "an employer possessing [discretion to transfer an employee to a lateral position] may not transfer an employee for reasons that infringe upon rights guaranteed by the United States Constitution."  950 F.2d at 321, 324.  It follows that Defendants violate the Equal Protection Clause if they surplus teachers on the basis of their race.  The parties dispute and offer conflicting evidence regarding whether Perrea would have been surplussed in the absence of the racial balance provisions.  Therefore, the Court will deny summary judgment to CPS on the claim that Perrea was discriminated against on the basis of his race in violation of the Equal Protection Clause.

As to Defendant Mary Hahn, the Court also must consider her defense that she is entitled to qualified immunity.  The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar

28

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity provides immunity from suit, not simply a defense to liability. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). Courts apply a two-part test to determine if qualified immunity applies: (1) determine whether the facts alleged would establish that the government official's conduct violated a statutory or constitutional right and (2) determine whether the specific right violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). A defendant is entitled to qualified immunity if her conduct violated a constitutional right, but that right was not clearly established at the time of the violation. *Id.* Courts can examine either issue first. *Pearson*, 129 S. Ct. at 818.

This Court already has determined that if the facts alleged are true then Hahn violated Perrea's right to equal protection under the Fourteenth Amendment to the Constitution.[8] The issue, therefore, is whether the right was clearly established. The contours of the right must be "particularized" and "must be sufficiently clear that a reasonable official would understand that what [she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Though the specific actions themselves need not have been found unlawful, the unlawfulness of the actions must be apparent in light of pre-existing law. *Id.* Courts in this Circuit generally look to only Supreme Court decisions and Sixth Circuit decisions to determine whether a right is clearly established for purposes of the qualified immunity analysis. *Cullinan v. Abramson*, 128

---

[8] The Court determined above that Defendants are entitled to summary judgment as to the race discrimination claims arising from 42 U.S.C. § 1981 and Title VII because they did not commit an actionable adverse action against Perrea. Hahn is entitled to summary judgment on the alternative grounds that she did not violate his rights and therefore she has qualified immunity as to those claims.

F.3d 301, 311 (6th Cir. 1997).

In this case, it would not have been sufficiently clear to a reasonable person that Hahn violated Perrea's equal protection rights if she surplussed Perrea on the basis of the staff racial balance provisions. The staff racial balance provisions in the collective bargaining agreement arose out of the *Bronson v. Board of Education of Cincinnati*, No. 1:74-cv-205 (S.D. Ohio), school desegregation case. The staff racial balance provisions previously had been upheld by the Sixth Circuit in *Jacobson v. Cincinnati Board of Education*, 961 F.2d 100 (6th Cir. 1992). This Court has concluded that today the Sixth Circuit would apply strict scrutiny analysis and find that the provisions are unconstitutional, but no court had so found in February 2008 when Perrea was surplussed. For these reasons, the Court concludes that Hahn did not violate a clearly established right and she is entitled to qualified immunity on Perrea's equal protection claim.

**B.     First Amendment Retaliation**

Perrea also alleges in the First Amended Complaint that Defendants retaliated against him in violation of the First Amendment. Perrea asserts that his requests to review the semester exams qualified as protected First Amendment speech and that Defendants retaliated against his exercise of that speech right by surplussing him. Defendants move for summary judgment on this claim on multiple grounds.

The Sixth Circuit has defined three elements of a First Amendment retaliation claim:

(1) the plaintiff was engaged in a constitutionally protected activity;

(2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and

(3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585-86 (6th Cir. 2008), *cert. denied*, 128 S. Ct. 2445 (2008). If the plaintiff meets his prima facie burden, then the defendants have a burden of production to show that they would have taken the same action in the absence of the protected activity. *Id.* at 586.

Defendants seek summary judgment first on the ground that Perrea's request for the semester exams did not constitute constitutionally protected speech. To establish that his speech was protected, a public employee plaintiff must establish three things:

> (1) his speech was not made in connection with his "official duties" as a school teacher, *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); (2) it touches on "a matter of public concern," *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); and (3) [his] interests in the speech outweigh the school board's interests in promoting "the effective and efficient fulfillment of its responsibilities to the public," *id.* at 150, 103 S.Ct. 1684.

*Baar v. Jefferson County Bd. of Educ.*, 311 F. App'x 817, 820-21 (6th Cir. 2009).

Regarding the official duties standard for protected speech, it is important to distinguish that "[t]he First Amendment protects some expressions related to the [public employee's] job." *Garcetti*, 547 U.S. at 421. The test is whether the public employee made the statements pursuant to their official duties. *Id.* "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* The First Amendment will not protect speech that consists solely of a public employee's work product. *Id.* at 422. For example, the Supreme Court determined in *Garcetti* that a deputy district attorney did not engage in protected speech when, pursuant to his official duties as the calendar deputy, he recommended the dismissal of pending criminal charges on the grounds that

a search warrant had been improperly obtained.  The Court explained as follows:

> The controlling factor in [the attorney's] case is that his expressions were made pursuant to his duties as a calendar deputy. . . .
>
> * * * *
>
> [The attorney] wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do.  The significant point is that the memo was written pursuant to [the attorney's] official duties.  Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id.* at 421-22.

The key question after *Garcetti* is whether the employee was required to make the speech in question as a part of his or her job duties.  "*Garcetti's* holding dealt only with speech that is required as part of the employee's duties as opposed to speech in the course of employment generally, and is thus consistent with our cases holding that speech in the course of employment may be entitled to First Amendment protection."  *Van Compernolle v. City of Zeeland*, 241 F. App'x 244, 249 n.3 (6th Cir. 2007); *see also Pittman v. Cuyahoga Valley Career Center*, 451 F. Supp. 2d 905, 929 (N.D. Ohio 2006) (holding that the *Garcetti* standard applies to only speech that was required by the job).  However, the phrase "official duties" is not to be limited to those tasks contained in a written job description.  "[A]d hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description."  *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007).  Following *Garcetti*, the Sixth Circuit found that a police officer's complaints to his police chief regarding cutbacks in canine training were not protected speech because they were made pursuant to his official duties as the department's canine handler.  *Haynes v. City of*

32

*Circleville, Ohio*, 474 F.3d 357, 364-65 (6th Cir. 2007).

Defendants contend first that Perrea's requests for CPS to release the semester exams were made in connection with his official duties as a CPS teacher, and therefore were not protected speech. Perrea's own testimony and statements, as cited in his brief, (doc. 35 at 14), establish that his requests for the semester exams arose from his official duties as a CPS teacher. Perrea explained at his deposition that preparing students for the semester exams was part of the teacher's job in teaching the curriculum at CPS. (Perrea Dep. 240-41.) He stated that teachers wanted the exams to be available so that they could "assist students in understanding their performance" on the exams. (*Id.* at 197 & Ex. 20.) He testified that he had gathered sixty-seven teachers' signatures because the teachers "were concerned about erroneous questions, invalid questions, [and] inaccurate exams." (*Id.* at 198.) Finally, in a letter to CPS's superintendent dated February 25, 2007, Perrea stated he wanted to have "an independent, qualified psychometrician" evaluate the "fairness, accuracy, and validity of the examinations." (*Id.* at 197 & Ex. 20.) Based on this testimony, Perrea requested to review the semester exams as part of his official duties. Accordingly, his speech was not protected by the First Amendment. *Garcetti*, 547 U.S. at 421; *Baar*, 311 F. App'x at 820-21.

Defendants also contend that being surplussed, even if motivated by retaliatory animus, was not the type of injury to "likely chill a person of ordinary firmness from continuing to engage in that activity." *Jenkins*, 513 F.3d at 585-86. To begin, Defendant points out that Perrea was not dissuaded from requesting the semester exams by being surplussed. Perrea filed a mandamus action in the Ohio Supreme Court seeking release of the exams in April 2008, approximately two months after being surplussed. Although the standard is "more objective

33

than subjective[,]" the fact that Perrea was not dissuaded from his attempts to obtain the records is evidence that a person of ordinary firmness would not be chilled.  *Smith v. Yarrow*, 78 F. App'x 529, 541 (6th Cir. 2003).  Additionally, as discussed above, being surplussed ordinarily does not constitute a materially adverse action.  Surplussing is provided for in CPS's collective bargaining agreement with the teachers' union as a means to address decreased enrollment or curriculum changes at a school, not as a punitive measure.  Surplussed teachers do not lose their employment or suffer a loss in pay.  In Perrea's situation, being surplussed did not result even in a lateral transfer to a different school.  The Court concludes under these facts that a person of ordinary firmness would not have been chilled from exercising his or her free speech rights by being surplussed by CPS.  *Cf.*, *Gritton v. Disponett*, No. 3:05-75-JMH, 2007 WL 3407459, at *6-9 (E.D. Ky. Nov. 14, 2007)[9] (finding that a lateral transfer would not chill the speech of an ordinarily firm person).

Therefore, the Court concludes as a matter of law on two grounds that Defendants did not retaliate against Perrea in violation of the First Amendment by surplussing him in February 2008.  The Court will grant summary judgment to Defendants on this claim.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (doc. 30) is **GRANTED** and Defendants' Motion for Summary Judgment (doc. 29) is **GRANTED IN PART AND DENIED IN PART**.  The Court declares as a matter of law that the CPS racial balance provisions violate the equal protection guarantee of the United States Constitution.  CPS is prohibited from further racial balancing in making staff employment decisions.

---

[9] *Aff'd on other grounds*, 332 F. App'x 232 (6th Cir. 2009).

However, summary judgment is granted to Defendants CPS and Hahn as to Perrea's claims for race discrimination in violation of Title VII, 42 U.S.C. § 1981, and Ohio Revised Code chapter 4112, and for violation of the First Amendment. Summary judgment also is granted to Hahn on the equal protection claim on the basis of qualified immunity. Summary judgment is denied to CPS as to Perrea's equal protection claim asserted pursuant to 42 U.S.C. § 1983.

IT IS SO ORDERED.

    s/Susan J. Dlott

Chief Judge Susan J. Dlott
United States District Court